# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD POTTS,** | : | **Civil No. 3:12-CV-1441** |
| | : | |
| **Plaintiff** | : | **(Judge Caputo)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **RONNIE HOLT, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION AND STATEMENT OF THE CASE

Stripped to its essentials this case presents the following question:  Did prison officials violate the clearly established constitutional rights of the plaintiff, a federal inmate, when they were compelled to briefly curtail his religious dietary preferences as they confronted an unprecedented institutional crisis, a prison lock-down and medical emergency resulting from a massive outbreak of food poisoning, an episode which compelled the closure of the prison's food services?  On the extraordinary and compelling circumstances of this case, we find that the defendants did not transgress Potts' clearly established rights, and, therefore, recommend that the Court enter summary judgment on behalf of the defendants.

On or around June 26, 2011, the United States Penitentiary at Canaan ("USP-Canaan") experienced a significant and extraordinary event: an outbreak of Salmonella food poisoning that was transmitted to inmates and prison staff through the consumption of tainted chicken. Hundreds of inmates and staff were sickened as a result, with inmates complaining of stomach cramps, vomiting, diarrhea, fever, and headaches. To address the situation, the prison was formally placed on lockdown on June 26, 2011. Two days later, all food services operations at USP-Canaan were suspended, and transferred to the adjacent Federal Prison Camp. The following day, June 29, 2011, the Food Service Administrator, Wayne Ryan, a defendant in this action, went on extended absence from USP-Canaan, and would not return for approximately six months.

In an effort to get their arms around this extraordinary occurrence, and to gain a measure of control over the situation, Health Services at USP-Canaan made the decision to initiate a "special or bland" diet for the entire inmate population, beginning with the lunch meal on June 29, 2011.[1] Inmates at USP-Canaan were thereafter served the "bland diet" for the breakfast, lunch, and dinner meals through July 8, 2011. By lunch on July 1, 2011, an enhanced menu had been approved with

---

[1] The "special bland diet" is described as a "BRAT-type (bananas, rice, applesauce and toast)." (Doc. 43, Def. SMF ¶ 13 and n.1) The diet consists of goods that are soft, not very spicy, and low in fiber. (Id.)

more menu items.  (Doc. 43-1, Declaration of DeShawn China ¶ 10 and attached email at pp. 2-4)  The defendants have provided a detailed and comprehensive overview of each meal that was approved and served to inmates throughout the lockdown, all of which contained a variety of foods, including non-flesh food items which were believed to adhere to religious dietary mandates.  (Doc. 43-1, China Decl., ¶¶ 9-21)  The normal food menu resumed on July 9, 2011, and on July 13, 2011, USP-Canaan returned to normal operations.

Richard Potts is an inmate at USP-Canaan and an adherent of Islam.  Potts was incarcerated at the prison at the time of the Salmonella outbreak and resulting lockdown.  As a practicing Muslim, Potts receives certified religious meals from the prison's food service, and represents that he has done so for more than a decade. During the lockdown at USP-Canaan, however, Potts stopped receiving certified religious meals for approximately two weeks, and this brief interruption to his religious diet inspired the instant lawsuit.

Potts brought this Bivens[2] action on July 26, 2012, and later amended his complaint on February 27, 2013, alleging that after the prison was placed on lockdown, his certified religious meals were discontinued without notice.  Potts claims that during the approximately two weeks that the prison went into lockdown

---

[2] Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

3

status, he "ate very little or nothing at all . . . and suffers greatly from all the consequences therefrom."  Potts does not elaborate on how he has "suffer[ed] greatly," and he does not explain what were the "consequences" of his declining to consume much if any of the food that was served to him as part of the special bland diet offered to inmates during the lockdown.  (Doc. 1, Am. Compl., p. 3)  He claims that during the lockdown, 36 certified meals were withheld from him by "Defendant." Although Potts claims that he "suffer[ed] greatly," he does not allege that actually suffered physical injury as a result of the withheld meals, or his decision not to consume much or any of the alternate meals that were made available to him during this time.[3]

Nevertheless, Potts has brought claims alleging that his First and Eighth Amendment rights guaranteed by the United States Constitution were violated as the

---

[3] This observation is in no way made to minimize or denigrate Potts's religious beliefs, or his assertion that he was aggrieved by being briefly deprived of certified religious meals.  Instead, the fact that Potts did not allege physical injury means, as a matter of law, that he is not entitled to recover compensatory damages in this action.  The Prison Litigation Reform Act provides that where an inmate makes a claim for mental or emotional injury suffered while in custody, the claim must be predicated on a showing of accompanying physical injury.  See Mitchell v. Horn, 318 F.3d 523, 533 (3d Cir. 2003); Miller v. Beard, 699 F. Supp. 2d 697, 709 n.9 (E.D. Pa. 2010).  Any such alleged physical injury must be more than de minimis.  Id.  Although compensatory damages are unavailable absent a showing of physical injury, an inmate claiming mental or emotional damage may nevertheless recover nominal or punitive damages if they can be proved.  Allah v. Al-Hafeez, 226 F.3d 247, 251-52 (3d Cir. 2000).

result of the dietary decisions made by prison officials during the approximately two weeks in late June and early July 2011 that followed the outbreak of food poisoning throughout the inmate population at the prison.

Potts also brings a claim under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-1 et seq. ("RFRA"), claiming that the decision to withhold certified religious meals during a two-week lockdown, and to make available for Potts the "special bland diet" being served to other inmates as well as the uniform meal service that briefly followed, violated the statute by imposing a substantial burden on Potts's sincerely held religious convictions without a sufficiently important countervailing governmental interest.  Potts has named as defendants Ronnie Holt, the former Warden at USP-Canaan who has retired since the events alleged in the complaint; Wayne Ryan, the Food Services Administrator; and DeShawn China, the Assistant Food Services Administrator at USP-Canaan.

The defendants have now moved to dismiss the amended complaint, or otherwise moved for summary judgment to be entered in their favor on all claims. The defendants argue all claims should be dismissed for lack of personal involvement, to the extent that Potts has not articulated how any of the three named defendants was responsible for the constitutional violations alleged in this case. Next, the defendants maintain that Potts has failed to make out a claim under the

RFRA.  Lastly, the defendants contend that they are entitled to summary judgment on Potts's claims brought for alleged First and Eighth Amendment violations, because the undisputed facts show that Potts's constitutional claims fail.  Alternatively, the defendants assert that they are entitled to qualified immunity on Potts's claims.[4]

Upon consideration, we recommend that the motion be granted, because under the unique facts of this case, the defendants are plainly entitled to qualified immunity from Potts's claims.  The evidence in the record shows that prison officials, including DeShawn China who was effectively running the food services operations immediately following the food poisoning outbreak, went to extraordinary lengths to minimize the health crisis that had broken out, including by overseeing the move of all food service operations to a satellite kitchen at an adjacent federal facility.  In a candid email to subordinates sent July 1, 2011, Mr. China acknowledged that the adjustments to the food preparation and delivery operations at USP-Canaan presented "a logistical nightmare," but commendably concluded that observation by emphasizing for his staff that "[i]t is imperative that we are attempting to make normal meal times" for inmates.  (Doc. 43-1, Declaration of DeShawn China, and

---

[4] The defendants also moved to dismiss any claims that were brought against them in their official capacities.  However, in his responsive brief, Potts made clear that he has sued the defendants only in their individual capacities, and thus it is unnecessary to address this argument.

email dated July 8, 2011 attached thereto)   Nothing in the amended complaint suggests that China's food services administration team failed in meeting this overarching goal during a time of great challenge affecting an entire prison.

Even accepting as true the plaintiff's representations that he ate "little" food following the salmonella outbreak and resultant disruption in the food services program for roughly two weeks, and that he in some unspecified way "suffered" as a result, we ultimately find that all of the defendants are entitled to qualified immunity on the plaintiff's claims.  It is undisputed that USP-Canaan experienced a health crisis that was widespread and acute, and that swift and decisive actions were thereafter taken that affected the meals provided to all inmates, including inmates like Potts who at all other times receive a certified religious meal.  But in temporarily suspending the provision of certified religious meals, and furnishing all inmates with a "special bland diet" for a short period of time, which included some non-meat options, prison administrators were acting in accordance with uncontested policy guidelines developed by the Bureau of Prisons,  and we do not find based on what are essentially undisputed facts that any of the three defendants reasonably could have been expected to know that their decisions regarding food safety and meal preparation for a two week period violated the United States Constitution or other federal law.

What Potts has really presented is an assertion that administrators at USP-Canaan – who were dealing with a significant crisis affecting large numbers of inmates that forced the closure of the prison's kitchen – should nevertheless have made additional efforts to make sure that Potts received a specially prepared meal perfectly conforming to his religious dietary needs.  As discussed more fully below, however, the defendants are entitled to qualified immunity from such claims, based on facts that are beyond dispute in this case, since none of the defendants could reasonably be expected to have known that their decisions in this regard could have been unlawful.

## II.   STANDARDS OF REVIEW

The defendants bring their motion pursuant to Rule 12(b)(6) and 56(a) of the Federal Rules of Civil Procedure.  We briefly summarize the standards of review applicable to dispositive motions brought pursuant to these rules.

### A.   Rule 12(b)(6) – Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted.  The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the

plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45–46 (1957) ). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 550 U.S. 544, 555. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of necessary elements of the plaintiff's cause of action. Id. at 556. Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 555).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir.2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but

which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."). However, the court may not rely on other parts of the record in determining a motion to dismiss. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).

### B.   Rule 56(a) – Motion for Summary Judgment

The defendants have also moved in the alternative for judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a

material fact is genuine only if there is a sufficient evidentiary basis that would allow

a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes

shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec.

& Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown

that there is an absence of evidence to support the nonmoving party's claims, "the

non-moving party must rebut the motion with facts in the record and cannot rest

solely on assertions made in the pleadings, legal memoranda, or oral argument."

Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary judgment

is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if

the non-moving party provides merely colorable, conclusory, or speculative evidence.

Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence

supporting the nonmoving party and more than some metaphysical doubt as to the

material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment."  Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995).  This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment.  With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial. " Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir. 2000), citing  Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17 (3d Cir. 1995).  In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for

12

> summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561
> (E.D.Mo.1996). Additionally, a party must respond to a hearsay
> objection by demonstrating that the material would be admissible at trial
> under an exception to hearsay rule, or that the material is not hearsay.
> See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003).
> The mere possibility that a hearsay statement will be admissible at trial,
> does not permit its consideration at the summary judgment stage. Henry
> v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa.

Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to

avoid summary judgment. Therefore, where a party simply presents inadmissible

hearsay declarations in an attempt to establish a disputed material issue of fact, courts

have typically rebuffed these efforts and held instead that summary judgment is

appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL

2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon Univ., No. 02-2104,

2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group Int'l v. Oriental Rug

Importers Assoc., Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by

. . . denying averments . . . without producing any supporting evidence of the

denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation

omitted). Thus, "[w]hen a motion for summary judgment is made and supported . .

., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co.

Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books,

Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)."  [A] mere denial is

insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the

veracity of the opposing affidavit is also not sufficient."  Lockhart v. Hoenstine, 411

F.2d 455, 458 (3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion

cannot expect to rely merely upon bare assertions, conclusory allegations or

suspicions."  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v.

Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, a party who seeks to resist a summary judgment motion must also

comply with Local Rule 56.1, which specifically directs a party opposing a motion

for summary judgment to submit a "statement of the material facts, responding to the

numbered paragraphs set forth in the statement required [to be filed by the movant],

as to which it is contended that there exists a genuine issue to be tried"; if the

nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be

served by the moving party will be deemed to be admitted."  L.R. 56.1.  Under the

Local Rules, the failure to follow these instructions  and appropriately challenge the

material facts tendered by the defendant means that those facts must be deemed,

since:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. This Local Rule serves several purposes. First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute. Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in <u>Celotex Corp. v. Catrett</u>, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designated specific facts showing that there is a genuine issue for trial*.' 477 U.S. 317, 324 (1986) (internal quotations omitted) (emphasis added).

<u>Doe v. Winter</u>, No. 04-CV-2170, 2007 U.S. Dist. LEXIS 25517, *2 n.2 (M.D. Pa. Apr. 5, 2007) (parallel citations omitted; court's emphasis). A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. <u>See</u> <u>Sanders v. Beard</u>, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); <u>Thomas v. Norris</u>, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## III. <u>DISCUSSION</u>

Although the defendants offer several different arguments in support of their motion, in our judgment the defendants have demonstrated that they are entitled to qualified immunity from Potts' claims, and there is no need to examine whether or not

Potts has sufficiently alleged personal involvement on the part of any defendant. Based upon our review of the undisputed facts relevant to this case, and mindful of the prevailing law in this field, we do not believe that any of the named defendants reasonably could have been expected to know that their decisions and actions with respect to food preparation and service in the two weeks following a large-scale outbreak of Salmonella within a United States Penitentiary would have violated Richard Potts's constitutional and statutory rights.

Federal officials sued in the performance of their job duties are entitled to qualified immunity, and are shielded from monetary damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005). In accordance with this doctrine, government officials will be immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise their discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in consideration of the circumstances presented by the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. This inquiry "must be undertaken in light of the specific context of the case." Id. at 201. Accordingly, "to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010).

In this case, Potts has included both statutory and constitutional claims in this case, alleging that the prison officials' actions violated both the First and Eighth Amendments to the Constitution, and also violated the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb et seq., ("RFRA"). Although it is quite clear that the defendants can assert qualified immunity as a defense against the constitutional claims alleged, it is somewhat less clear that they may be entitled to rely on qualified immunity with respect to the RFRA claim. In 2004, the United

17

States Court of Appeals for the Ninth Circuit observed that, at that time, no "court of appeals [had] decided whether qualified immunity is available to a federal government official sued under RFRA." Kwai Fun Wong v. United States, 373 F3.d 952, 977 (9th Cir. 2004). However, lower courts have in numerous cases applied qualified immunity principles to RFRA claims, see, e.g., Romero v. Lappin, No. 10-35-ART, 2011 WL 3422849, Lebron v. Rumsfeld, 764 F. Supp. 2d 787, 804 (D.S.C. 2011); Harrison v. Watts, 609 F. Supp. 2d 561, 574-75 (E.D. Va. 2009); Jama v. U.S.I.N.S., 343 F. Supp. 2d 338, 376 (D.N.J. 2004); Haff v. Cooke, 923 F. Supp. 1104 (1996). Furthermore, later appeals courts have also upheld lower court decisions granting qualified immunity to federal prison officials on RFRA claims, Weinberger v. Grimes, No. 07-6461, 2009 WL 331632, at *5 (6th Cir. Feb. 10, 2009). One district court surveying the law in this field observed an "emerging trend of legal authority" standing for the proposition that qualified immunity is applicable to RFRA claims, Jama v. United States, No. C09-0256-JCC, 2010 WL 771789, at *8 (W.D. Wash. Mar. 2, 2010), and we thus join this trend in recommending that the court find that qualified immunity principles apply in this setting.

In enacting RFRA, Congress intended to incorporate the standard governing free exercise claims that prevailed in federal court prior to the Supreme Court's 1990 decision in Employment Division v. Smith, 494 U.S. 872 (1990). See City of Boerne

v. Flores, 521 U.S. 507, 515 (1997).  Congress thus aimed to restore what in its view

is the right to the free exercise of religion that is guaranteed by the First Amendment

to the Constitution, "both [in] substance and scope."  Rasul v. Myers, 563 F.3d 527,

532-33 (D.C. Cir. 2009).

Nevertheless, "[c]laims under the First Amendment and claims under the

RFRA are analyzed separately."  Garraway v. Lappin, 490 F. App'x 440, 443 (3d Cir.

2012).  When a prisoner asserts a First Amendment free exercise claim, as Potts has

done in this case, charging that "a prison policy is impinging on [his] constitutional

rights," the courts must apply the four factor test set forth in Turner v. Safley, 482

U.S. 78 (1987), to determine whether the curtailment at issue is "reasonably related

to penological interests."  DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000) (citing

Turner, 482 U.S. at 89).  The Third Circuit explained:

> [Turner] directs courts to assess the overall reasonableness of such
> regulations by weighing four factors.  "First, there must be a 'valid,
> rational connection' between the prison regulation and the legitimate
> governmental interest put forward to justify it," and this connection must
> not be "so remote as to render the policy arbitrary or irrational."
> Second, a court must consider whether inmates retain alternative means
> of exercising the circumscribed right.  Third, a court must take into
> account the costs that accommodating the right would impose on other
> inmates, guards, and prison resources generally.  And fourth, a court
> must consider whether there are alternatives to the regulation that "fully
> accommodate[ ] the prisoner's rights at de minimis cost to valid
> penological interests."

Id. (citing Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir.1999) (internal citations omitted)).  In contrast, "a challenged restraint on the freedom of religion does not fall within the scope of the RFRA unless the inmate can establish that a 'substantial burden' is placed on his ability to exercise said freedom."  Garraway, 490 F. App'x at 444 (citing Small v. Lehman, 98 F.3d 762, 767 (3d Cir. 1996) (overruled on other grounds by Boerne)).

The Third Circuit has explained that a "substantial burden" exists where:  (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.  Washington v. Klem, 497 F.3d 272, 280 (3d Cir.2007).  It is only once a substantial burden on religion has been established by the prisoner that the government must then establish "that it has a 'compelling interest' in its actions and is furthering that interest by the 'least restrictive means.' "  Small, 98 F.3d at 767 (citations omitted).

Mindful of these legal guidelines, we conclude that the three named defendants would be entitled to qualified immunity on Potts's RFRA claim.  Potts argues that he has made out a *prima facie* case under the RFRA because Defendant China

"substantially burdened Plaintiff by replacing his Kosher/Halaal meals with meals contaminated by unkosher/unhalaal food items." (Doc. 47, at 4)  He also argues that the failure of prison officials to notify him that the service of certified religious meals would be briefly discontinued in the wake of a prison-wide health emergency amounts to a violation of his rights under the First and Eighth Amendments.  Potts claims that he was substantially burdened by being served the "special bland diet," but he does not persuasively allege or show that the temporary disruption to his certified religious diet caused him to abandon his religious beliefs or convictions.  In a case involving similar facts, albeit a deprivation of religious meals for a somewhat shorter duration, the Third Circuit found that a lack of notice and brief discontinuance of religious meals was an inconvenience, and not a substantial burden.  See Norwood v. Strada, 249 F. App'x 269, 272 (3d Cir. 2007) (no substantial burden where inmate was denied certified religious meal for seven meals); cf. Said v. Donate, No. 07-1028, 2007 WL 2207908 (M.D. Pa. July 30, 2007) (free exercise claim) (no viable claim where the plaintiff merely alleged that he "avoided eating food which did not comport with his religious diet").  Not only do these decisions cast substantial doubt upon Potts's claims in this case, they provide support for the view that prison officials facing a food-borne health crisis within a penitentiary affecting scores of inmates and staff could not believe that temporarily disrupting Potts's certified religious meals

would nonetheless place an unjustified and substantial burden on Potts's religious interests.

Moreover, the Bureau of Prisons maintains a written policy that expressly allows staff to temporarily suspend service of certified religious meals during times of emergency. That policy was followed in this case, and in accordance with the Certified Food Component Procedures, inmates who participated in the certified food component were placed temporarily on the medical diet. (Def. SMF ¶ 16.) The Bureau of Prisons' Food Service Manual allows the religious diet program to be modified with an alternate menu when authorized by policy, (id. ¶ 68), and alternate menus are permissible during emergency situations such as the lockdown that occurred in this case, (id. ¶ 69). The existence of such a policy, together with the foregoing case law, further supports a finding that none of the named defendants could reasonably have been expected to realize that their administrative decisions over a two week period in response to a genuine emergency would violate Potts's constitutional rights or substantially burden his right to exercise his religion. See Hammons v. Saffle, 348 F.3d 1250, 1253 (10th Cir. 2003)(qualified immunity on inmate First Amendment claim for prison officials who followed prison policy); Jeffers v. Gomez, 267 F.3d 895 (9th Cir. 2001)(qualified immunity for prison officials who followed prison policy).

The defendants are also entitled to qualified immunity on Potts' free exercise claim.  Potts contends that the defendants fail to satisfy any prong of the <u>Turner</u> analysis, allegedly because the food services department at USP-Canaan knew that Potts received certified religious meals; that he was not notified that his religious meals would be temporarily discontinued; that if the food services administrators had only handled the meal service differently in the wake of the salmonella outbreak the orderly operation of the prison would, in Potts's subjective view, not have been interrupted; and because the food services staff "obviously" could have provided breads, fruits, or packaged bologna.  (Doc. 47, at 6-8)  In the face of undisputed evidence that administrators at USP-Canaan were trying to manage a precipitous and potentially calamitous health crisis affecting scores of inmates, Potts's subjective views on prison administration and food service are hardly sufficient to create a factual dispute with respect to his free exercise claim.  Moreover, Potts's own views, even if sincerely held, fail to discredit a finding under the facts of this case that qualified immunity is warranted for the defendants, since none of the defendants could reasonably have been expected to know, in the context of the uniquely challenging and compelling factual scenario existing within USP-Canaan in late June

and early July 2011, that their temporary food service decisions amounted to a violation of Potts' First Amendment rights.[5]

Indeed, we note that at the time of these events the United States Court of Appeals for the Third Circuit had held that a brief interruption of an inmate's Halaal certified diet during a prison lockdown emergency did not unfairly burden the prisoner's exercise of his First Amendment rights. Norwood v. Strada, 249 F. App'x 269, 272 (3d Cir. 2007)  Further, the court of appeals had repeatedly recognized that, in a prison setting, an inmate's First Amendment rights do not include an absolute right to a diet which meets his specific dietary preference. See e.g., Garraway v. Lappin, 490 F. App'x 440, 442 (3d Cir. 2012) cert. denied, 133 S. Ct. 876, 184 L. Ed. 2d 687 (U.S. 2013); DeHart v. Horn, 390 F.3d 262 (3d Cir. 2004).   Thus, the defendants' actions appear to have fallen squarely within a range of conduct previously approved by the courts.  Given this legal landscape, it is difficult to see

---

[5] In DeHart v. Horn, the Third Circuit noted that it was "clear" that prisons have an interest in "an efficient food system," and that in some scenarios refusal to grant certain requests for religious diets may bear rational relation to such legitimate concern.  227 F.3d 47, 52 (3d Cir. 2000).  In this case, the prison's interest was even more acute than in the ordinary case.  The undisputed facts indicate that the food services administrators were attempting to manage food service for an entire penitentiary, after the prison's kitchen was ordered to be closed following the discovery of food-borne salmonella, and all food preparation and coordination was moved to an offsite location during a health emergency and prison lockdown that lasted two weeks.

how these officials could have understood that their actions violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999).

In addition, when these actions are viewed through the constitutional First Amendment paradigm applicable in a prison setting as defined by the Supreme Court in Turner v. Safley, 482 U.S. 78 (1987), it is apparent that prison officials could not have recognized that their response to this crisis violated Potts' clearly established rights. Under Turner, "[f]irst, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Turner v. Safley, 482 U.S. 78, 89 (1987). Here, the brief service of bland meals with meat, and non-meat options, was rationally related to the prison's vital interest in providing sustenance to inmates while also containing a food borne contagion, in a factual context where prison food services had been severely curtailed. "A second factor relevant in determining the reasonableness of a prison restriction, . . . , is whether there are alternative means of exercising the right that remain open to prison inmates." Turner v. Safley, 482 U.S. 78, 90 (1987). By providing nutritionally adequate meals with meat and non-meat options, prisons officials reasonably concluded that they were providing, on an emergency basis, alternative means for exercising the prisoners' religious beliefs. "A third consideration is the impact

25

accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Turner v. Safley, 482 U.S. 78, 90 (1987). In this case, consideration this third factor strongly underscores that prison officials could not have recognized that their actions violated any inmates' clearly established First Amendment rights. At the time of these events, prison officials were presented with an unprecedented crisis: closed prison food service facilities, hundreds of stricken prisoners, and a virulent food borne contagion in the prison. Given these facts, prison official reasonably could have concluded that efforts to endeavor to perfectly accommodate every inmates' dietary preferences in the midst of this crisis would have imposed an insurmountable burden on prison resources. "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Turner v. Safley, 482 U.S. 78, 90 (1987). In this case, other than arguing that prison staff should have catered his meals to his individual religious preferences while they dealt with this extraordinary health emergency affecting hundreds of prisoners, Potts provides no other ready, and reasonable, alternatives to the course followed here by the defendants. Since "the absence of ready alternatives is evidence of the reasonableness of " any prison policy, Turner v. Safley, 482 U.S. 78, 90 (1987), this complete absence of other feasible options for addressing this

institutional crisis is powerfully persuasive proof that these actions should not be seen as violating Potts' clearly established constitutional rights.

Lastly, to the extent Potts is attempting to fashion an Eighth Amendment claim relating to his brief deprivation of a certified religious diet, we find that this claim would fail as a matter of law, and that the defendants would in any event be entitled to qualified immunity on this claim.  Essentially, Potts is alleging that the conditions of his confinement during the two-week lockdown at USP-Canaan were unconstitutional, because he elected to eat little of the food that was served to him during this time since he found it did not conform to his religious needs.

The Eighth Amendment prohibits cruel and unusual punishment, which includes the unnecessary and wanton infliction of pain by prison officials.  U.S. Const. amend. VIII; Farmer v. Brennan, 511 U.S. 825 (1994).  The Eighth Amendment imposes certain duties on prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  To allege a viable Eighth Amendment claim based on the conditions of confinement, an inmate must allege (1) a deprivation that is sufficiently serious and (2) that the defendant was deliberately indifferent to the deprivation. Young v. Quinlan, 960 F.2d 351, 359-60 (3d Cir. 1992).  Moreover, conditions of

confinement will violate the Eighth Amendment if the deprivation is sufficiently serious, which the Supreme Court has held means that the inmate has been denied "the minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834. Moreover, for an Eighth Amendment claim to lie, prison officials must have acted with deliberate indifference to the health or safety of the inmate, meaning that the prison officials acted with recklessness. Id. at 834-35; Wilson v. Seiter, 501 U.S. 294, 303 (1991). Thus, in order to find an Eighth Amendment violation with respect to conditions of confinement, the plaintiff must present evidence showing that the prison officials were "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Under the Eighth Amendment, prisoners are guaranteed a nutritionally adequate diet. Wilson, 501 U.S. at 303 (1991); see also Farmer, 511 U.S. at 832-33 (Eighth Amendment requires prison officials to "ensure that inmates receive adequate food . . . ."). In this case, Potts does not allege that the defendants failed to provide him with food that was adequate in terms of quantity or nutritionally quantity. Instead, he has alleged that he was deprived of a certified religious diet for approximately two weeks, but acknowledges that during this time he was provided with a medical diet and with the "special bland diet" that was utilized for all inmates

28

during the lockdown and concomitant disruption to normal food service operations experienced at the prison.   Potts claims that he elected to eat little of this diet, although the evidence from defendant China shows that Potts was served numerous food items during this time that, while not certified as religious and while limited, would appear to have included food items that did not run afoul of Potts's religious restrictions, including non-flesh options.   Moreover, the defendants have submitted uncontroverted evidence showing that the meals that were served were nutritionally adequate.   (Doc. 43, Def. SMF ¶ 64-67)

In cases where inmates have challenged the denial or temporary deprivation of certified religious meals, courts have found that even if the inmates could make out a free exercise challenge or other claim that the food service imposed a substantial burden on the exercise of religion, the allegations nevertheless fail to state a claim under the Eighth Amendment.   See McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004) (affirming the dismissal of inmate's Eighth Amendment claim based on imposition of restrictive "loaf" diet because the inmate did not allege that the diet was nutritionally inadequate, posed a health risk, or actually injured the plaintiff, but finding that the inmate had stated a First Amendment free exercise claim); LaFevers v. Saffle, 936 F.2d 1117, 1120 (10th Cir. 1991) (affirming dismissal of Eighth Amendment claim brought by Seventh Day Adventist based on deprivation of

29

requested vegetarian meals, holding that "the mere denial of a requested [religious] diet is insufficient to establish a cognizable Eighth Amendment claim." ); Campbell v. Cornell Corrections of Rhode Island, Inc., 564 F. Supp. 2d 99, 103 (D.R.I. 2008).

Likewise, courts have found that where the evidence is clear that prison officials were contending with lockdowns or other emergency situations, the limited deprivation of special diets or some cutback in the meal service will not give rise to a claim under the Eighth Amendment.  See, e.g., Waring v. Meachum, 175 F. Supp. 2d 230, 240-41 (D. Conn. 2001); McLeod v. Scutlly, No. 81 Civ. 3189, 1984 WL 692, at *2 (S.D.N.Y. July 30, 1984) (no violation where inmates were provided two meals a day during lockdown).

Indeed, in such circumstances courts are to remain especially mindful that prison officials must be given leeway to make administrative decisions when matters of security within the institution are at issue.  See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119 (1977); Turner v. Safley, 482 U.S. 78, 84-85 (1987) (courts should be hesitant to interfere with internal prison administration, which is a matter in the realm of the expertise of prison officials).  Following this guidance, one district court confronting a variety of inmate claims relating to alleged deprivations during a period a lockdown within a prison declined to find an Eighth Amendment violation where prison officials failed to provide a plaintiff with a prescribed diet or

30

to provide some religious meals during part of the Ramadan holiday during a time of emergency within the institution.  See Waring v. Meachum, 175 F. Supp. 2d 230, 241 (D. Conn. 2001).  The analysis of that case applies with equal force to this case.

Moreover, and critically for Potts's Eighth Amendment claim, there is nothing in the amended complaint or the record submitted that could show that prison officials acted with deliberate indifference.  To the contrary, the record shows that prison officials were endeavoring to manage a health crisis within the institution that resulted in the closure of the prison's kitchen, and the transfer of food service operations to a satellite facility.  The evidence, including contemporaneous emails from defendant China, indicate that prison officials were working conscientiously and diligently to meet the dietary needs of inmates and to ensure the provision of three suitable, nutritional meals per day despite what was described at the time as a "logistical nightmare."  Against these facts, Potts's Eighth Amendment claim simply fails.

Furthermore, even if Potts could conceivably state an Eighth Amendment claim based upon the temporary disruption in his certified religious diet, we would nonetheless recommend that the Court find that the defendants are entitled to qualified immunity on this claim, because prison officials reasonably could not have been expected to know that their food service decisions during the emergency

lockdown could have violated the Eighth Amendment, particularly where inmates were served nutritionally adequate meals during this time.

## IV.    **RECOMMENDATION**

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED THAT the defendants' motion to dismiss or, in the alternative, for summary judgment (Doc. 39) be GRANTED and the case closed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

***/s/ Martin C. Carlson***
Martin C. Carlson
United States Magistrate Judge

Dated: January 22, 2014