**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

RICHARD POTTS,

      Plaintiff,

         v.

RONNIE HOLT, *et al.*,

      Defendants.

CIVIL ACTION NO. 3:CV-12-1441

(JUDGE CAPUTO)

(MAGISTRATE JUDGE CARLSON)

## MEMORANDUM

Presently before the Court is Magistrate Judge Carlson's Report and Recommendation (Doc. 51) to Defendants Warden Ronnie Holt ("Warden Holt"), Wayne Ryan ("Ryan"), and DeShawn China's ("China) (collectively, "Defendants") Motion to Dismiss and/or for Summary Judgment. (Doc. 39.)  Plaintiff Richard Potts ("Potts"), an inmate at USP Canaan and a practicing Muslim, contends that Defendants violated the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq*., and deprived him of his constitutional rights under the First and Eighth Amendments when his certified religious meals were discontinued, without notice, for approximately two weeks while the prison was on lockdown following an outbreak of salmonella food poisoning that sickened the inmate population.  Because Defendants are entitled to qualified immunity on all of Potts' claims, the motion to dismiss and/or for summary judgment will be granted.

### I. Background

**A.     Relevant Factual Background**

For over ten years, Potts has been provided with certified religious meals by the Bureau of Prisons. (*Am. Compl.*, ¶ 3(1).)  On June 25, 2011, Potts was provided with a certified religious meal that was packaged in accordance with the religious diet program. (*Id*. at ¶ 3(2).)

The next day, USP Canaan was placed on lockdown following inmate complaints of

stomach cramps, vomiting, diarrhea, fevers, and headaches, (*China Decl.*, ¶ 2), after they ate contaminated meat that was served in the prison dining hall. (*Am. Compl.*, ¶3(2).) Potts, however, was not sickened because he had been provided with a certified religious meal. (*Id*. at ¶ 3(2).)  That evening, Potts was served a spaghetti and meatball dinner, while other inmates were served satellite hot meals. (*Id*. at ¶ 3(4).)

On June 28, 2011, all food service operations at USP Canaan were suspended and moved to the adjacent Federal Prison Camp after Health Services received a preliminary report indicating that the presence of salmonella had sickened the inmate population. (*China Decl.*, ¶¶ 4-5.)  Inmates participating in the certified food component were placed on the medical diet that day. (*Id*. at ¶ 6; *Potts Decl.*, ¶ 7.)  However, none of the religious diet participants had been sickened by salmonella. (*Potts Decl.*, ¶ 8.)

On June 29, 2011, USP Canaan staff was advised that the Food Service Department would be closed until further notice and meals would be prepared at the Federal Prison Camp. (*China Decl.*, ¶ 7.)  Health Services directed at that time that all inmates would receive the special (bland) diet. (*Id*.)  The special (bland) diet continued on June 30, 2011. (*Id*. at ¶ 9.)

According to China, Assistant Food Service Administrator at USP Canaan, "[o]n July 1, 2011, Health Services approved an enhanced menu beginning with the lunch meal." (*Id*. at ¶ 10.)  In his declaration, China details the breakfast, lunch, and dinner menu from July 1, 2011 through July 12, 2011 (USP Canaan resumed normal operations on July 13, 2011), with the exception of lunch and dinner on July 5, 2011. (*Id*. at ¶¶ 10-22.)  These meals were part of the "modified menu beginning on July 1, 2011." (*Id*. at Attach. 1, p.2.)

On July 7, 2011, "USP Canaan Food Service began to be used for food preparation." (*China Decl.*, ¶ 16.)

China also indicates that the "normal menu was restarted" on July 9, 2011. (*China*

2

*Decl.*, ¶ 18.)  Documents attached to China's declaration suggest that the modified menu may have continued until at least dinner on July 11, 2011. (*Id*. at Attach. 1, p.9.)

Potts objects to China's statement that an "enhanced menu" was approved by Food Services on July 1, 2011.  Rather, Potts maintains that "Food Service continued its medical diet meal, but as an <u>option</u> to be fed along side of the regular satellite meals throughout the completion of the lockdown on July 13th, 2011." (*Potts Decl.*, ¶ 15 (emphasis in original).) Potts relies on a document entitled "Modified Menu Beginning 7/1/2011," which is attached to China's declaration. (*China Decl.*, Attach. 1, p.2.)  That document provides, in pertinent part:

> This menu will begin on July 1, 2011 beginning on the Lunch Meal.  The 400 Medical Diets will be continued in addition to the meals provided until the Lunch Meal on July 3, 2011.
>
> Unit Officers will be provided the list of inmates that need Medical Diets. *Medical Diets are an alternative option to the regular meals; meaning the inmate may choose a Medical Diet vs. the Regular Meal.*

(*Id*. (emphasis added).)

China communicated with other staff members pertaining to issues relating to food service during the lockdown.  For instance, on July 6, 2011, he referred to a communication with his foreman about inmate Rankins, "who is allergic to everything to include: Fish, Carrots, Rice, Tomatoes, Beans, Soy, Gluten, MSG, and Processed Meats." (*Id*. at Attach. 1, p.6.)  China followed up on that issue on July 8, 2011 with an email to the Food Service Department reminding that they "prepare a meal for inmate Rankins in SHU." (*Id*. at Attach. 1, p.7.)  That email also instructs staff members to "remember to prepare no flesh alternatives as well.  My suggestion is to utilize the Religious Diet Meals (Vegan) to accomplish this." (*Id*.)

Potts, however, with the possible exception of dinner on July 3, 2011, (*Potts Decl.*, ¶ 12), did not receive any certified religious meals from July 1, 2011 through July 12, 2011. (*Id*. at ¶ 18.)  Thus, during the period the prison was on lockdown, thirty-six or more certified

3

religious meals were withheld from Potts. (*Am. Compl.*, ¶ 10.)

Pursuant to the Certified Food Component Procedure, "[i]nmates participating in the certified food component are not authorized to consume mainline or hot bar food items, . . ." (*China Decl.*, Attach. 2.)  However, the Bureau of Prisons' Food Service Manual states that an alternate menu may be provided "[i]n emergency situations such as an institution lock down." (*Id*. at Attach. 3.)  In such emergency situations, "the Certified Food Component of the Religious Diet Program is met as soon as inmates can be located and identified as Certified Food Participants." (*China Decl.*, ¶ 27.)  Potts was never notified that the religious diet program was suspended, and he faithfully adhered to the program and did not eat what was delivered to his housing unit, (*Am. Compl.*, ¶ 15), because inmates consuming food outside the religious diet program can be removed from it. (Doc. 52, 2-3.)  As a result, Potts ate very little and most of the time he did not eat at all during the lockdown. (*Id*. at ¶ 14.)

## B.   Procedural History

Based on the foregoing, Potts commenced this action on July 26, 2012 against Warden Holt and Ryan. (Doc. 1.)  On November 8, 2012, Defendants Warden Holt and Ryan filed a motion to dismiss and/or for summary judgment. (Doc. 20.)  Magistrate Judge Carlson denied that motion as moot on February 26, 2013 (Doc. 35) in view of Potts' request to amend his complaint. (Doc. 31.)  Potts' Amended Complaint was docketed on February 27, 2013. (*Am. Compl*.)  Named as Defendants in the Amended Complaint are Warden Holt, Ryan, and China. (*Id*.)  The Amended Complaint asserts claims for violation of the First Amendment, the Eighth Amendment, and the RFRA. (*Id*.)

On May 13, 2013, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment. (Doc. 39.)  In their motion, Defendants argue that: the Amended Complaint fails to allege personal involvement; Potts fails to state a claim under the RFRA; the undisputed material facts establish that they are entitled to judgment as a

4

matter of law on the First and Eighth Amendment claims; and they are entitled to qualified immunity. (Doc. 44.)  Potts timely filed a brief in opposition to Defendants' motion on June 24, 2013 (Doc. 47), and Defendants filed their reply brief in further support of their motion on July 8, 2013. (Doc. 49.)  Potts filed a brief in opposition to Defendants' reply on July 26, 2013. (Doc. 50.)

On January 22, 2014, Magistrate Judge Carlson issued the instant Report and Recommendation recommending that Defendants' motion be granted on the basis of qualified immunity. (Doc. 51.)  Potts filed objections to the Report and Recommendation on February 14, 2014. (Doc. 52.)  Defendants filed a brief in opposition to Plaintiff's objections on February 28, 2014. (Doc. 53.)  Potts did not file a reply brief in further support of his objections.  As such, the Report and Recommendation and Pott's objections thereto are ripe for review.

## II. Legal Standard

Where objections to the Magistrate Judge's report are filed, the court must conduct a *de novo* review of the contested portions of the report. *Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989) (citing 28 U.S.C. § 636(b)(1)(c)).  However, this only applies to the extent that a party's objections are both timely and specific. *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984) (emphasis added).  In conducting a *de novo review*, the court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge. *See* 28 U.S.C. § 636(b)(1); *Owens v. Beard*, 829 F. Supp. 736, 738 (M.D. Pa. 1993).  Although the review is *de novo*, the law permits the court to rely on the recommendations of the magistrate judge to the extent it deems proper. *See United States v. Raddatz*, 447 U.S. 667, 675–76, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980); *Goney*, 749 F.2d at 7; *Ball v. United States Parole Comm'n*, 849 F. Supp. 328, 330 (M.D. Pa. 1994). Uncontested portions of the report may be reviewed at a standard determined by the district

court. *See Thomas v. Arn*, 474 U.S. 140, 154, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Goney*, 749 F.2d at 7.  At the very least, the court should review uncontested portions for clear error or manifest injustice. *See, e.g., Cruz v. Chater*, 990 F. Supp. 375, 376-77 (M.D. Pa. 1998).

### III. Discussion

Potts claims Defendants violated the RFRA and deprived him of his constitutional rights protected by the First and Eighth Amendments.  Magistrate Judge Carlson recommends Defendants' motion to dismiss and/or for summary judgment be granted, and Potts objects to this recommendation.  Although I will reject and modify portions of the Report and Recommendation, I will adopt Magistrate Judge Carlson's ultimate recommendation that Defendants be afforded qualified immunity on all claims for the reasons set forth in detail below.

**A.      The Report and Recommendation and Potts' Objections**

**1.      The Report and Recommendation**

On January 22, 2014, Magistrate Judge Carlson issued the instant Report and Recommendation. (Doc. 51.)  According to Magistrate Judge Carlson, it is unnecessary to consider whether the Amended Complaint fails to state a claim upon which relief can be granted or whether Defendants are entitled to judgment as a matter of law. (*Id*. at 15-16.) Instead, noting the "unique facts of this case," Magistrate Judge Carlson concludes that "defendants are plainly entitled to qualified immunity from Potts' claims." (*Id*. at 6.)  The Report and Recommendation explains:

> Even accepting as true the plaintiff's representations that he ate "little" food following the salmonella outbreak and resultant disruption in the food services program for roughly two weeks, and that he in some unspecified way "suffered" as a result, we ultimately find that all of the defendants are entitled to qualified immunity on the plaintiff's claims.  It is undisputed that USP-Canaan experienced a health crisis that was widespread and acute, and that swift and decisive actions were thereafter taken that affected the meals provided to all inmates, including inmates like Potts who at all other times receive a certified religious meal.  But in temporarily suspending the provision

6

of certified religious meals, and furnishing all inmates with a 'special bland diet' for a short period of time, which included some non-meat options, prison administrators were acting in accordance with uncontested policy guidelines developed by the Bureau of Prisons, and we do not find based on what are essentially undisputed facts that any of the three defendants reasonably could have been expected to know that their decisions regarding food safety and meal preparation for a two week period violated the United States Constitution or other federal law.

What Potts has really presented is an assertion that administrators at USP-Canaan- who were dealing with a significant crisis affecting large numbers of inmates that forced the closure of the prison's kitchen- should nevertheless have made additional efforts to make sure that Potts received a specially prepared meal perfectly conforming to his religious dietary needs. As discussed more fully below, however, the defendants are entitled to qualified immunity from such claims, based on facts that are beyond dispute in this case, since none of the defendants could reasonably be expected to have known that their decisions in this regard could have been unlawful.

(*Id.* at 7.)

The Report and Recommendation then addresses in detail each of Potts' three claims. First, with respect to the RFRA claim, the Report and Recommendation notes that Potts "does not persuasively allege or show that the temporary disruption to his certified religious diet caused him to abandon his religious beliefs or convictions." (Doc. 51, 21.) Magistrate Judge Carlson reasons that the Third Circuit's decision in *Norwood v. Strada*, 249 F. App'x 269 (3d Cir. 2007) supports "the view that prison officials facing a food-borne health crisis within a penitentiary affecting scores of inmates and staff could not believe that temporarily disrupting Potts' certified religious meals would nonetheless place an unjustified and substantial burden on Potts' religious interests." (Doc. 51, 21-22.) Considering *Norwood* in addition to Bureau of Prisons policy allowing the religious diet program to be modified with alternate menus during emergency situations such as lockdowns, Magistrate Judge Carlson concludes that "none of the named defendants could reasonably have been expected to realize that their administrative decisions over a two week period in response to a genuine emergency would violate Potts' constitutional rights or substantially burden his right to exercise his religion." (*Id.* at 22.)

Second, as to the First Amendment claim, the Report and Recommendation provides

that "none of the defendants could reasonably have been expected to know, in the context of the uniquely challenging and compelling factual scenario existing within USP-Canaan in late June and early July 2011, that their temporary food service decisions amounted to a violation of the Potts' First Amendment rights." (*Id*. at 23-24.)  Magistrate Judge Carlson further explains that analyzing Defendants' actions under the framework set forth in *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), Defendants could not have recognized that their responses violated Potts' clearly established rights. (Doc. 51, 25.)

Finally, regarding the Eighth Amendment claim, the Report and Recommendation concludes that the claim fails as a matter of law, and, in any event, Defendants are entitled to qualified immunity on the claim. (Doc. 51, 27.)  Specifically, the Report and Recommendation emphasizes that there is nothing in the Amended Complaint or the factual record demonstrating that prison officials acted with deliberate indifference.  The Report and Recommendation further provides that even if Potts could state an Eighth Amendment claim based upon the disruption of the religious diet program, Defendants "are entitled to qualified immunity on this claim, because prison officials reasonably could not have been expected to know that their food service decisions during the emergency lockdown could have violated the Eighth Amendment, particularly where inmates were served nutritionally adequate meals during this time." (*Id*. at 31-32.)

### 2.    Potts' Objections

Potts filed objections to the Report and Recommendation on February 14, 2014. (Doc. 52.) Potts sets forth six specific objections to the Report and Recommendation.  First, Potts argues that Magistrate Judge Carlson improperly concludes that the denial of certified religious meals from July 1, 2011 through July 13, 2011 was merely a *de minimis* deprivation of his rights.  As stated by Potts, "the Court must not allow the extraordinary, compelling, significant, health crisis etc., of the first four days of the food poisoning outbreak

to cause this Court to make light, under the *de minimis* standard, of the additional eleven secured and stable days of the lockdown, during which Plaintiff's religious beliefs were substantially burdened by the Defendants." (Doc. 52, 2.)  Second, Potts contends that Magistrate Judge Carlson overlooks BOP policy and religious principles which prevented him from consuming any foods outside of the religious diet program, even during an emergency lockdown.  Third, Potts objects to Magistrate Judge Carlson's recommendation that Defendants, namely, China, would not have reasonably been aware that their decisions with respect to food preparation and service in the two weeks following the outbreak of salmonella would violate the Constitution.  Fourth, Potts maintains that the Report and Recommendation fails to recognize that the medical and security risks at the beginning of the lockdown no longer existed as of July 1, 2011.  In particular, Potts emphasizes that the special diet was available in addition to the modified/enhanced menu as of July 1, 2011. Fifth, Potts objects to the conclusion that Defendants are entitled to qualified immunity on his free exercise claim, contending that Defendants failed to notify him of the suspension of the religious diet program and inform him of alternate foods that he was permitted to consume.  Further, within this objection Potts argues that the Report and Recommendation fails to account for facts in the record indicating that the religious diet program could have been resumed before July 13, 2011.  Potts' final objection is to Magistrate Judge Carlson's conclusion that Defendants are entitled to qualified immunity on his Eighth Amendment claim.

### 3.     Potts' Objections to the Factual Record Will Be Sustained

As indicated, Potts objects to the Report and Recommendation on the basis that it omits relevant facts of record.  I agree, and I will thus sustain this objection to the Report and Recommendation.  For example, the Report and Recommendation indicates that all inmates at USP-Canaan were served the special medical diet through July 8, 2011. (Doc.

51, 2, 28-29.)   However, documents in the record demonstrate that as of July 1, 2011, inmates had the option of selecting either the medical diet or the regular meal. (*China Decl.*, Attach. 1, p.2.)   Additionally, the Report and Recommendation fails to mention that USP Canaan Food Service began to be utilized for food preparation on July 7, 2011 (*China Decl.*, ¶ 16), which was six days before the religious diet program was resumed.   Further, the Report and Recommendation fails to recognize that dietary accommodations were made for at least one inmate during the lockdown. (*China Decl.*, Attach. 1, p.6.)   The Report and Recommendation also does not identify the fact in the record that China instructed Food Service staff on July 8, 2011 to "utilize the Religious Diet Meals (Vegan)" to "prepare no flesh alternatives." (*China Decl.*, Attach. 1, p.7.)   Moreover, the Report and Recommendation disregards statements in Potts' declaration that, pursuant to Bureau of Prisons' policy, "inmates participating in the certified food component are not authorized to consume mainline or hot bar food items," (*Potts' Decl.*, ¶ 9), and participants in the food component caught doing so would be removed from the program. (Doc. 52, 2-3.)   Lastly, the Report and Recommendation does not identify that after the certified food component of the religious diet program is suspended during emergency situations, it "is met as soon as inmates can be located and identified as Certified Food Participants." (*China Decl.*, ¶ 27.) I will thus sustain Potts' objections to the factual record, and the Report and Recommendation's factual findings are thus modified to conform to the facts as detailed in this Memorandum.   Nevertheless, for the reasons explained below, Defendants' motion will be granted because they are entitled to qualified immunity based on the facts of this case.

**B.     Qualified Immunity**

The Report and Recommendation recommends that Defendants' motion be granted on the basis of qualified immunity.   "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Henry v. City of Erie*, 728 F.3d 275, 280 (3d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).   The doctrine of qualified immunity applies to free exercise claims under the First Amendment, *see, e.g., Sutton v. Rasheed*, 323 F.3d 236, 258-60 (3d Cir. 2003), and Eighth Amendment conditions of confinement claims, *see, e.g., Hill v. Scampone*, No. 11-1553, 2012 WL 3864952, at *8-10 (M.D. Pa. Sept. 5, 2012).

But, the United States Court of Appeals for the Third Circuit has yet to address whether a qualified immunity defense is available to claims under the RFRA.  Other Courts of Appeals, however, have considered this issue and found that the doctrine of qualified immunity applies to RFRA claims. *See, e.g., Walden v. Ctrs. for Disease Control and Prevention*, 669 F.3d 1277, 1285 (11th Cir. 2012) ("The defense of qualified immunity applies not only to constitutional claims, but also to claims brought for alleged violations of RFRA."); *Lebron v. Rumsfeld*, 670 F.3d 540, 557 (4th Cir. 2012) ("This case is an appropriate one for the recognition of the immunity defense because it would run counter to basic notions of notice and fair warning to hold that personal liability in such an unsettled area of law might attach.   The following discussion underscores why it would be impermissible for us to conclude that the relevant law was clearly established in anything like a manner that would vitiate a qualified immunity defense.   We thus dismiss Padilla's RFRA claim on qualified immunity grounds."); *Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) (per curiam) (holding, in the alternative, that federal officials were entitled to qualified immunity against claims brought for violations of RFRA); *Weinberger v. Grimes*, No. 07-6461, 2009 WL 331632, at *5 (6th Cir. Feb. 10, 2009) (affirming district court's decision granting qualified immunity to a federal prison official on a RFRA claim).   District courts have similarly held that qualified immunity applies to claims brought for violations of

11

the RFRA. *See, e.g., Romero v. Lappin*, No. 10-35, 2011 WL 3422849, at *2 (D. Ky. Aug. 4, 2011); *Jama v. United States*, No. 09-2056, 2010 WL 771789, at *8 (D. Wash. Mar. 2, 2010); *Harrison v. Watts*, 609 F. Supp. 2d 561, 574-75 (E.D. Va. 2009) (holding, in the alternative, that the dismissal of the RFRA claim would be appropriate based on qualified immunity); *Jama v. U.S.I.N.S.*, 343 F. Supp. 2d 338 (D.N.J. 2004).   I will adopt the reasoning of these courts and hold that the defense of qualified immunity applies to claims brought for violations of the RFRA.

Therefore, as the defense of qualified immunity can apply to all claims raised by Potts, at issue is whether Defendants are entitled to qualified immunity in this case.  "[T]he standard for granting or denying a motion for summary judgment does not change in the qualified immunity context." *Curley v. Klem*, 298 F.3d 271, 282 (3d Cir. 2002) (citing *Karnes v. Skrutski*, 62 F.3d 485, 494 (3d Cir. 1995)).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  "A defendant has the burden to establish that he is entitled to qualified immunity." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004).   The Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).   "Thus, we ask: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010).   Courts may address the two *Saucier* prongs in any order, at their discretion. *Pearson*, 555 U.S. at 236, 129 S. Ct. 808.   I will first consider

whether, viewing the facts in the light most favorable to Potts, he has established the violation of a statutory or constitutional right.

### 1.    Violation of a Statutory or Constitutional Right

#### a.    The RFRA Claim

First, with respect to Potts' statutory claim, the Report and Recommendation appears to conclude that he fails to establish a violation of the RFRA. (Doc. 51, 21.)[1]  Although this presents a close question, when the facts are viewed in the light most favorable to Potts, and noting that the parties have yet to engage in formal discovery in this action, he adequately demonstrates a violation of his rights under the RFRA.

The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*., provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government can demonstrate that "the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.[2]  As such, the plaintiff has the burden of establishing the elements of a *prima facie* case, and once a *prima facie* case has been demonstrated, the Government bears the burden of showing a compelling interest and that it used the least restrictive means to carry out that interest. *Conestoga Wood Specialties v. Sebelius*, 917 F. Supp. 2d 394, 410 (E.D. Pa. 2013).

---

[1]    The Report and Recommendation further provides, however, that even if such a claim is established by Potts, qualified immunity is nevertheless appropriate in light of the specific context of this case under the second prong of the qualified immunity analysis. (Doc. 51, 22.)

[2]    Courts have also determined that a plaintiff must make a threshold showing that his or her beliefs are sincerely held and religious in nature to be entitled to protection under the RFRA. *See, e.g., Ford v. Bureau of Prisons*, No. 12-0873, 2013 WL 5603587, at *5 (M.D. Pa. Oct. 11, 2013) (citations omitted); *see also Njos v. Carney*, 12-1375, 2014 WL 949833, at *5 n.5 (M.D. Pa. Mar. 11, 2014)

A substantial burden exists, according to the Third Circuit, where:

(1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Garraway v. Lappin*, 490 F. App'x 440, 444 (3d Cir. 2012) (quoting *Washington v. Klem*, 497

F.3d 272, 280 (3d Cir. 2007)).

In *Norwood v. Strada*, 249 F. App'x 269, 270 (3d Cir. 2007) (per curiam), the plaintiff

filed a complaint alleging his rights under the RFRA were violated as a result of the partial

(or even total) reduction of seven meals during a prison lockdown in November 2005.[3] After

the district court granted the defendant's motion to dismiss or, in the alternative, for

summary judgment, the plaintiff appealed. *See id*. at 270-71.

The Third Circuit affirmed, concluding that the plaintiff failed to present sufficient

evidence of a substantial burden on his religion in opposition to the defendant's motion for

summary judgment. *See id*. at 270.  The court emphasized that "[r]equiring a prisoner to eat

food forbidden by his religion's dietary regiment may 'substantially burden' one's religious

practice and the cases generally indicate that prison administrators must provide an

adequate diet without violating an inmate's religious dietary restrictions in order not to

unconstitutionally burden free exercise rights." *Id*. (citing *Williams v. Morton*, 343 F.3d 212,

219) (3d Cir. 2003)).  Essentially, an inmate has a "right not to be forced into a Hobson's

choice of either eating food items which offend one's religious beliefs, or eating very little

or not at all." *Id*. at 272.  But, the Third Circuit in *Norwood* emphasized that the issue was

much more circumscribed, as the question was "whether a short denial of such a diet during

---

[3]     The emergency lockdown was initiated in *Norwood* "following an altercation between inmates[ ] representing certain volatile geographical and racial groupings." Def.'s Statement of Facts, *Norwood v. Strada*, No. 1:05-cv-2410 (M.D. Pa. Feb. 21, 2006), ECF No. 18, Ex. 2, ¶ 3.

14

an emergency lockdown was a 'substantial burden,' or a mere *de minimis* intrusion." *Id*. (citation omitted).  The court concluded that the partial or total denial of seven meals was a *de minimis* intrusion, stating that "it is incredible that in such a short time period Norwood would have been forced to abandon one of the precepts of his religions, or that he would have felt substantial pressure to modify his beliefs.  Thus, we determine that Norwood failed to submit sufficient evidence that his religious beliefs were substantially burdened." *Id*.

Here, when the evidence is viewed in the light most favorable to Potts, he sufficiently demonstrates that his religious beliefs were substantially burdened.  Unlike in *Norwood* where the plaintiff was denied only portions of seven religious meals over three days, Potts presents evidence that he was denied his certified religious diet for at least thirty-six meals over an approximate twelve-day span.  Moreover, the record indicates that if Potts consumed mainline food without notice that the religious diet program was suspended, he would have been removed from the program.  As a result, he ate very little over the final two weeks of the lockdown.  Based on this evidence, and viewing it in the light most favorable to Potts, he was presented with a Hobson's choice indicating a substantial burden on his religion: consume the non-certified religious food and risk being removed from the religious diet program or refrain from eating in order to adhere to his faith. *Cf. Wilson v. City of New York*, No. 12-3021, 2013 WL 4710386, at *4 (S.D.N.Y. Aug. 30, 2013) (denial of at least one religious meal per day for fifteen days adequately stated a claim under the Religious Land Use and Institutionalized Persons Act of 2000).  And, as the evidence in the record when viewed in the light most favorable to Potts suggests that religious diet meals could have been prepared during the lockdown, (*China Decl.*, Attach. 1, p.7), Defendants fail to satisfy their burden of establishing that they used the least restrictive means to satisfy their compelling interests to control the spread of salmonella during the lockdown.  Qualified immunity on the RFRA claims under the first prong of *Saucier* is not warranted.

15

Nevertheless, for the reasons explained below, Defendants are entitled to qualified immunity on the RFRA claim under *Saucier*'s second prong.

> **b.     The First Amendment Claim**

The Report and Recommendation also concludes Potts fails to demonstrate a violation of his rights under the First Amendment. (Doc. 51, 24-27.)  The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ." U.S. Const. amend. I.  "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987) (citation omitted).  Nevertheless, "the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates." *DeHart v. Horn*, 227 F.3d 47, 50-51 (3d Cir. 2000) (en banc) (citing *Pell v. Procunier*, 417 U.S. 817, 822-23, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)).

Absent a legitimate penological interest, an inmate generally has a right to a diet consistent with his or her beliefs under the Free Exercise Clause. *See, e.g., DeHart*, 227 F.3d at 52;  *Njos v. Carney*, 12-1375, 2014 WL 949833, at *11 (M.D. Pa. Mar. 11, 2014); *see also Wall v. Wade*, 741 F.3d 492, 498 (4th Cir. 2014) (inmate has a right under the Free Exercise Clause to a diet consistent with his "religious scruples").  Prison policies and regulations impacting an inmate's request for a religious diet are considered under the framework set forth by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). *See DeHart*, 227 F.3d at 50-61.[4]  In *Turner*, the Supreme Court set

---

[4]     The mere assertion of a religious belief, however, does not automatically trigger First Amendment protection.  Rather, only those beliefs which are sincerely held and religious in nature are afforded constitutional protection. *DeHart*, 227 F.3d at 51.

forth the standard for reviewing a prison regulation challenged on constitutional grounds:

"when a prison regulation impinges on inmates' constitutional rights, the regulation is valid

if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.

Ct. 2254.  The Third Circuit has explained:

> [*Turner*] directs courts to assess the overall reasonableness of such regulations by weighing four factors.  "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to render the policy arbitrary or irrational."  Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally.  And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests."

*Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999) (internal citations omitted).

While *Turner* does not identify whether the inmate or the prison bears the burden of

proving these factors, the Third Circuit applies "a two-step analysis for determining whether

a prison's regulation is reasonably related to a penological interest." *Sharp v. Johnson*, 669

F.3d 144, 156 (3d Cir. 2012).  "First, the prison has the burden of demonstrating the first

*Turner* factor.  This burden is slight, and in certain circumstances, the connection may be

a matter of common sense.  Second, if the prison meets its burden under the first *Turner*

factor, then we consider the other *Turner* factors." *Id.* (citations and internal citations

omitted).

The Report and Recommendation concludes that Potts' rights were not violated

under the *Turner* factors. (Doc. 51, 25-26.)  However, the present state of the record does

not allow for a sufficient analysis of the *Turner* factors. *See, e.g., Daley v. Lappin*, - - - F.

App'x - - -, 2014 WL 306932, at *3 (3d Cir. Jan. 29, 2014) (remanding the plaintiff's First

Amendment claim to allow further development of the record to conduct the *Turner*

analysis); *Thompson v. Smeal*, 513 F. App'x 170, 173 (3d Cir. 2013) (finding record was not

properly developed with regard to the *Turner* factors); *Warren v. Pennsylvania*, 316 F. App'x

109, 115 (3d Cir. 2008) (vacating judgment on the First Amendment claim because the record was not sufficiently developed to engage in the *Turner* analysis).[5]  In particular, the second *Turner* factor "requires a court to focus on the burden that the regulation imposes on an inmate's ability to engage in constitutionally protected activity." *DeHart*, 227 F.3d at 53.  This factor requires consideration of whether "other avenues of religious practice were open" to Potts, not merely consideration of the specific practice at issue. *Id*. at 54; *see also Daley*, 2014 WL 306932, at *3 n.9 ("consideration of this factor on remand may require inquiry into the ways Daley's religion is practiced and the extent to which he was able to practice his religion through avenues other than his diet.").  Here, the record is silent as to whether Potts was able to practice his religion through avenues other than his diet.

Regarding the third *Turner* factor, there is no evidence in the record as to "the impact of accommodating [Potts'] dietary requests on inmates, prison personnel, and allocation of prison resources." *DeHart v. Horn*, 390 F.3d 262, 269 (3d Cir. 2004).  In particular, the Report and Recommendation's conclusion that accommodating "every inmates' dietary preferences in the midst of this crisis would have imposed an insurmountable burden on prison resources," (Doc. 51, 26), is not substantiated by the record.  Moreover, the suggestion that maintaining the religious diet program during the lockdown would unreasonably drain prison resources is at odds with evidence in the record suggesting that "no flesh alternatives" could be prepared using the "Religious Diet Meals (Vegan)." (*China. Decl*, Attach 1, p.7.)  Further, as the record also indicates that the prison was able to accommodate one inmate's dietary restrictions for medical reasons, (*id*. at Attach. 1, p.6), it is unclear how accommodating an inmate's religious dietary requirements would

---

[5]     With regard to the first *Turner* factor, I agree with the Report and Recommendation that there was a rational connection between the regulation and Defendants' interest, *i.e.*, preventing the spread of salmonella through the inmate population and ensuring the medical well-being of prisoners and staff.

nonetheless have unduly burdened prison resources.

With respect to the final *Turner* factor, based on the present state of the record, I do not agree with the Report and Recommendation's finding that there was a "complete absence" of feasible alternatives. (Doc. 51, 26.)  Under this factor, courts must "consider whether alternatives exist to fully accommodate the right at *de minimis* cost." *Thompson v. Smeal*, 513 F. App'x 170, 173 (3d Cir. 2013). This requires consideration of whether there is an absence of "ready alternatives" to the challenged prison regulation, "as the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90, 107 S. Ct. 2254. This is not a "least restrictive test," and prison officials need not "set up and shoot down every conceivable alternative method" of accommodation. *Id*.  However, "[i]f an inmate can point to an alternative that would fully accommodate his or her rights at a '*de minimis*' cost, we can consider that as evidence that the challenged regulation is unreasonable." *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003) (citing *Turner*, 482 U.S. at 90-91, 107 S. Ct. 2254).  Here, documents submitted by Defendants indicate that food from the certified religious program could have been prepared, and, as such, provision of certified religious meals during the lockdown appears, on this record, to have been a "ready alternative" to the special medical diet and the regular menu. (*China Decl.*, Attach. 1., pp.2,7.)

In sum, the record is not sufficiently developed to determine whether the suspension of the religious diet program during the lockdown violated Potts' free exercise rights. *See, e.g., Daley*, 2014 WL 306932, at *3. While "*Turner* does not call for placing each factor in one of two columns and tallying a numerical result," *DeHart*, 227 F.3d at 59, the Third Circuit has emphasized that application of *Turner* requires "a contextual, record-sensitive analysis." *DeHart*, 227 F.3d at 59 n.8.  Because such an analysis cannot be adequately performed on the present record, I reject the Report and Recommendation's application of

19

*Turner* to the facts of this case.

### c.   Eighth Amendment Claim

Lastly, the Report and Recommendation concludes that, under the facts of this case, Potts is unable to establish an Eighth Amendment conditions of confinement claim as a matter of law. (Doc. 51, 27.)  I agree.

The Eighth Amendment to the United States Constitution prohibits the use of cruel and unusual punishment. *See* U.S. Const. amend. VIII.  The Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement," and "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).  Prison officials violate the Eighth Amendment when they are deliberately indifferent to inmate health or safety and when this act or omission results in the denial of "the minimal civilized measure of life's necessities." *Id*. at 834, 114 S. Ct. 1970.  As such, prison officials can be held liable under the Eighth Amendment for denying humane conditions of confinement only where the officials "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 847, 114 S. Ct. 1970.  Furthermore, "'an accident or inadvertence or mere negligence does not in itself trigger the Eighth Amendment.'" *Rodriguez v. Nichols*, 521 F. App'x 47, 48 (3d Cir. 2013) (quoting *Grabowski v. Jackson Cnty. Pub. Defenders Office*, 47 F.3d 1386, 1395 n.12 (5th Cir. 1995)).

Here, nothing in the record indicates that Potts was denied a nutritionally adequate diet, and the uncontroverted evidence submitted by Defendants demonstrate that the meals

were nutritionally sufficient.  More significantly, however, is that the record is devoid of evidence which would support a finding that prison officials acted with deliberate indifference.  At most, Defendants could be said to have acted negligently by failing to notify Potts of the suspension of the religious diet program or by failing to reinstate the program prior to the prison resuming normal operations.  But, there is nothing in the record suggesting that Defendants knew of and nevertheless disregarded a substantial risk to Potts' health.  Accordingly, I will adopt the recommendations that Potts is unable to satisfy the first prong of *Saucier* and that Defendants be afforded qualified immunity on the Eighth Amendment claim.[6]

### 2.    Clearly Established Right

Because the facts when viewed in the light most favorable to Potts establish a violation of his rights under the RFRA and the First Amendment, it is necessary to consider the second prong of *Saucier*, *i.e.*, whether the right at issue was clearly established at the time of the alleged misconduct.  Magistrate Judge Carlson recommends that Defendants' motion be granted because reasonable officials would not have recognized that their administrative food service decisions during an approximately two-week prison lockdown that followed the outbreak of salmonella in the inmate population could violate an inmate's rights under the RFRA or the First Amendment.  I will adopt this recommendation.

A legal right is clearly established if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987); *Doe v. Delie*, 257

---

[6]    Moreover, even if Potts was able to establish a violation of his constitutional rights under the Eighth Amendment, Defendants would nevertheless be entitled to qualified immunity because a reasonable official would not have recognized that the suspension of the religious diet program during a two week prison lockdown resulting from the outbreak of food poisoning would violate an inmate's clearly established Eighth Amendment rights.

F.3d 309, 318 (3d Cir. 2001) ("The issue is whether, given the established law and the information available to Defendants, reasonable prison officials in Defendants' positions could have believed that their conduct was lawful.").   The inquiry under the clearly established prong "focuses on the official's actual situation, [and] the analysis 'must be undertaken in light of the specific context of the case, not as a general proposition . . . .'" *Montanez v. Thompson*, 603 F.3d 243, 251 (3d Cir. 2010) (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. 2151).

Here, Potts' claims are based on the broadly stated proposition that "[u]nder both the First Amendment and RFRA, 'the right of a prisoner to a diet consistent with his religious beliefs (unless refusal to provide such a diet is reasonably related to legitimate penological interests) was clearly established well before [2011]." *Njos v. Carney*, 12-1375, 2014 WL 949833, at *11 (M.D. Pa. Mar. 11, 2014) (citing *Jupiter v. Johnson*, No. 10-1968, 2011 WL 4527803, at *15 (M.D. Pa. Apr. 26, 2011)).   A constitutional or statutory duty, however, "is not clearly established simply because of the existence of a broad imperative like the one against 'unreasonable . . . seizures,'" *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011), or the one addressing the free exercise of religion. *See also Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999) ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police. . . . [T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.  In this case, the appropriate question is the objective inquiry whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed."). "'If the test of clearly established law were to be applied at this level of generality, it would bear no relationship

to the 'objective legal reasonableness' that is the touchstone of *Harlow*.'" *Schneyder*, 653 F.3d at 329 (quoting *Anderson*, 483 U.S. at 639, 107 S. Ct. 3034). "Thus, the usual rule is that 'the right the official is alleged to have violated must have been clearly established in a more particularized, and hence, more relevant, sense . . . .'" *Id*. (quoting *Anderson*, 483 U.S. at 640, 107 S. Ct. 3034). As such, "the court must define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).

Nevertheless, while the Supreme Court "appears to require a relatively high degree of specificity before a rule can be called 'clearly established,' the Court was at pains to emphasize that '[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Schneyder*, 653 F.3d at 329 (quoting *Anderson*, 483 U.S. at 640, 107 S. Ct. 3034 (citations omitted)). Rephrased, "there does not have to be precise factual correspondence between the case at issue and a previous case in order for a right to be clearly established . . . ." *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (quotations omitted). Accordingly, "officials can still be on notice that their conduct violates established law even in novel factual circumstances, as long as the law gave the defendant [official] fair warning that his conduct was unconstitutional." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259-60 (3d Cir. 2010) (citations and quotation omitted).

The instant case involves a novel factual circumstance. Indeed, the parties have not cited, nor am I aware of, any cases, precedential or otherwise, that involve the denial of religious meals during a prison-wide lockdown that resulted after an outbreak of food poisoning (or disease generally) in the inmate population.[7] As a result, no directly on-point

---

[7]     In *Tucker v. Metts*, No. 10-1316, 2011 WL 1085031, at *1 (D.S.C. Feb. 17, 2011), the plaintiff alleged that he and other prisoners were placed on lockdown while

case law provided Defendants with notice that their administrative decisions with respect to food service during a two-week lockdown following an outbreak of salmonella poisoning could violate Potts' rights under the RFRA and the First Amendment.

Nevertheless, a unique factual scenario by itself does not preclude a finding that an official did, in fact, violate clearly established law. "'To determine whether a new scenario is sufficiently analogous to previously established law to warn an official that his/her conduct is unconstitutional, we inquire into the general legal principles governing analogous factual situations . . . and determine whether the official should have related this established law to the instant situation.'" *Schneyder*, 653 F.3d at 330 (quoting *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 177 (3d Cir. 2011)). "A plaintiff 'can demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court.'" *Id*. (quoting *Estate of Escobedo v. Bender*, 600 F.3d 770, 779-80 (7th Cir. 2010)).

Here, Potts has not presented such a closely analogous case, and I have not identified any decisions that are readily comparable to the matter *sub judice*.  This is also not such an extraordinary case in which "a broad principle of law can clearly establish the rules governing a new set of circumstances if the wrongfulness of an official's action is so obvious that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'"

---

they suffered from food poisoning.  The plaintiff in *Tucker*, however, asserted claims under the Eighth Amendment. *See id*. at *2.  Similarly, in *Zerby v. McNeil*, No. 09-284, 2010 WL 2711658, at *1 (N.D. Fla. May 14, 2010), the plaintiff asserted claims under the Eighth Amendment involving the service of rotten and contaminated food that included an incident of institution-wide food poisoning.

*Schneyder*, 653 F.3d at 330 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002)).  I recognize Potts' contentions that the record indicates that the prison was stable for approximately the final twelve days of the lockdown, that both the regular and special diet menus were available as of July 1, 2011, that the prison was apparently able (and willing) to accommodate the medical dietary restrictions of at least one inmate during the lockdown, and that because prison officials failed to notify him of the temporary suspension of the religious diet program he could eat very little out of fear that he would be removed from the program.  Nevertheless, a reasonable person in Defendants' circumstances would not have realized that their conduct violated federal law.  That is, a hypothetical, reasonable prison official responsible for prison food service decisions would not have believed that discontinuing the religious diet program for approximately two weeks during a prison lockdown necessitated by the outbreak of food poisoning would violate an inmate's constitutional or statutory rights, especially in view of the fact that inmates were provided with nutritionally adequate meals containing non-meat, religiously acceptable food choices. *Cf. Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168 (9th Cir. 2013) (explaining the "hypothetical reasonable officer"); *Monteiro v. City of Elizabeth*, 436 F.3d 397, 409 (3d Cir. 2006) (Fisher, J, dissenting) ("The hypothetical 'reasonable person' is an objective observer, who is aware of the facts known to the official but possesses an independent knowledge of governing legal precepts.").  While Potts identifies additional or alternative action that Defendants could have taken to protect his interests, qualified immunity is intended "to giv[e] 'officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *George v. Rehiel*, 738 F.3d 562, 572 (3d Cir. 2013) (quoting *Farmer v. Moritsugu*, 163 F.3d 610;613 (D.C. Cir. 1998); *Aschcroft v. Al-Kidd*, - - - U.S. - - -, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011)).  Under the unique and novel factual circumstances of this case, and in view of the dearth of on-point or closely

analogous precedential or persuasive authority suggesting otherwise, Defendants are entitled to qualified immunity.

### IV. Conclusion

For the above stated reasons, Defendants' motion to dismiss and/or for summary judgment will be granted on the basis of qualified immunity.  Judgment will be entered in favor of Defendants and against Potts on all claims.

An appropriate order follows.


April 8, 2014                                                      /s/ A. Richard Caputo
Date                                                                  A. Richard Caputo
                                                                         United States District Judge

26